IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MONOLITHIC POWER SYSTEMS, INC., )
)
              Plaintiff, )
)
    v. )
)
INTERSIL CORPORATION, )
)
            Defendant. )

16 - 1125

C.A. No. _____

█████████████████████

**REDACTED PUBLIC VERSION**

## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

*Of Counsel*

John P. Schnurer
John D. Esterhay
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, CA 92130-2594
(858) 720-5700
jschnurer@perkinscoie.com
jesterhay@perkinscoie.com

Dated:  December 6, 2016

ASHBY & GEDDES

John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Monolithic Power Systems, Inc.*



FILED

DEC - 6 2016

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

{01171407;v1 }

# TABLE OF CONTENTS

Page

I.    STATEMENT OF NATURE AND STAGE OF THE PROCEEDING…………………..1

II.   STATEMENT OF FACTS……………………………………………………….…......1

   A.  MPS Has Been Financially Successful As Competitor Intersil Has Struggled……….1

   B.  MPS's Close Customer Relationships Are Critical To Its Business…………………..2

   C.  Intersil Unlawfully Obtained and Is Improperly Disclosing MPS Trade Secrets
       About The Operation of MPS Products……………………………………………..3

III.  LEGAL STANDARDS……………………………………………………………...6

IV.   ARGUMENT…………………………………………………………………….…...7

   A.  MPS Will Succeed on the Merits of its Trade Secret Claims…………………………7

        1.  The Information Intersil Disclosed Qualifies As MPS's Trade Secrets……….7

        2.  Intersil "Misappropriated" the Trade Secrets As Statutorily Defined…………9

   B.  MPS Is Threatened With Imminent, Irreparable Harm………………………………10

   C.  Granting a TRO to MPS Will Not Result In Harm to Intersil………………………..12

   D.  The Public Interest Factors Favor Granting a TRO to MPS…………………………13

   E.  A Nominal Bond Is Appropriate………………………………………………………13

V.    CONCLUSION………………………………………………………………………..14

## TABLE OF AUTHORITIES

<u>Cases</u>

*BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs., LLC,*
  425 F.3d 964 (11th Cir. 2005) ..........................................................................12

*Bimbo Bakeries USA, Inc. v. Botticella,*
  613 F.3d 102 (3d Cir. 2010)......................................................................10, 13

*Cerner Corp. v. Visicu, Inc.,*
  667 F. Supp. 2d 1062 (W.D. Mo. 2009) ............................................................9

*Cont'l Grp., Inc. v. Amoco Chems. Corp.,*
  614 F.2d 351 (3d Cir. 1980)................................................................................6

*Fitzgerald v. Mountain Laurel Racing, Inc.,*
  607 F.2d 589 (3d Cir. 1979)..............................................................................12

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
  730 F.2d 61 (2d Cir. 1984)................................................................................11

*Kos Pharms., Inc. v. Andrx Corp.,*
  369 F.3d 700 (3d Cir. 2004)................................................................................6

*Mattern & Assocs., L.L.C. v. Seidel,*
  678 F. Supp. 2d 256 (D. Del. 2010)....................................................................7

*Multi- Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,*
  22 F.3d 546 (4th Cir. 1994) ..............................................................................12

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.,*
  69 F. App'x 550 (3d Cir. 2003) ...............................................................7, 11, 14

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
  290 F.3d 578 (3d Cir. 2002)..............................................................................12

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  102 F.3d 12 (1st Cir. 1996)...............................................................................12

*SI Handling Sys., Inc. v. Heisley,*
  753 F.2d 1244 (3d Cir. 1985)........................................................................7, 13

*Warren v. City of Athens,*
  411 F.3d 697 (6th Cir. 2005) ............................................................................12

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
    No. CIV.A 09-157 JAP, 2011 WL 1226365 (D. Del. Mar. 28, 2011)................................8

## Statutes and Rules

18 U.S.C. § 1839(3) .....................................................................................................................8

18 U.S.C. § 1839(5) .....................................................................................................................9

18 U.S.C. § 1839(5)(A) ...............................................................................................................9

18 U.S.C. § 1839(5)(B)(i) ..........................................................................................................10

18 U.S.C. § 1839(5)(B)(ii)(III) ..................................................................................................10

18 U.S.C. § 1839(6)(A) ...............................................................................................................9

6 Del. C. § 2001(1) .......................................................................................................................9

6 Del. C. § 2001(2) .......................................................................................................................9

6 Del. C. § 2001(2)(a) ..................................................................................................................9

6 Del. C. § 2001(2)(b)(1) ...........................................................................................................10

6 Del. C. § 2001(2)(b)(2)(c) .......................................................................................................10

6 Del. C. § 2001(4) ....................................................................................................................7-8

Fed. R. Civ. P. 65 .........................................................................................................................1

Fed. R. Civ. P. 65(c) ...................................................................................................................13

## I. STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

Plaintiff Monolithic Power Systems, Inc. ("MPS") respectfully requests that this Court issue a temporary restraining order against Defendant Intersil Corporation ("Intersil") pursuant to Federal Rule of Civil Procedure 65 to prohibit Intersil from continued misappropriation and unauthorized use and disclosure of MPS's confidential trade secrets about the operation of MPS's products, and a confidential failure analysis identifying a rare failure in an early version of one of MPS's products, which has since been corrected. Intersil—which acquired MPS's confidential trade secrets through improper and unlawful means—is continuing to disseminate MPS's highly confidential trade secret product data to current and potential customers of MPS in an effort to fraudulently induce such customers to purchase Intersil products instead of MPS products. Even worse, Intersil is misrepresenting to MPS customers the confidential failure analysis conducted by MPS through false and defamatory statements.

Intersil's continued disclosure of MPS's trade secrets is causing irreparable harm to MPS. As MPS's business is the design, development and sale of highly technical semiconductor products, MPS derives actual economic value from the confidential design and operation of its products, as well as the ability to conduct tests of its products without every result being made public. Allowing MPS's customers and competitors to have unfettered access to this confidential information would destroy MPS's reputation and business. As a result, MPS seeks a temporary restraining order until an evidentiary hearing and the Court's ruling on MPS's request for preliminary injunction. A temporary restraining order will maintain the status quo until the full hearing on the preliminary injunction, and it will not result in any harm to Intersil, since it is narrowly tailored to only prevent Intersil from continuing to use and disclose MPS trade secrets that Intersil unlawfully acquired in the first place.

## II. STATEMENT OF FACTS

### A. MPS Has Been Financially Successful As Competitor Intersil Has Struggled.

MPS is a world leader in the development, design, manufacture, and sale of semiconductor products. MPS's products include multi-phase controllers, which provide power

conversion for components inside computers, tablets, and mobile phones.  MPS's unmatched

technical innovation in semiconductor design is reflected in its achievement of double-digit

revenue growth year-over-year for the past several years.  Intersil competes with MPS for sales

of semiconductor products, including multi-phase controllers, where Intersil's products often

compete directly against MPS's.  In contrast to MPS, Intersil has suffered negative revenue

growth for the past several years.

**B.     MPS's Close Customer Relationships Are Critical To Its Business.**

As a designer and supplier of highly technical semiconductor products, two of MPS's

most critical assets for its business are its confidential trade secrets about how its products

operate—which were made possible through years of effort and hundreds of millions of dollars

expended on research and development (Samsi Decl. ¶ 9)[1]—as well as MPS's close and

continuing relationships with its customers.  Over the years, MPS has worked hard to build up its

reputational goodwill with its customers by working closely with them during the design process,

and being responsive to their needs.

As part of MPS's relationship with its customers, MPS sends, from time to time,

technical documents about the operation of MPS's products, which MPS considers highly

confidential, and which may contain that customer's confidential information.  When MPS

creates and sends such a document to a customer, these documents are clearly labeled with

confidential markings like "MPS Confidential-Internal Use Only."  (*Id.* ¶ 3.)  MPS sends these

documents to its customers to resolve particular development issues that require a more detailed

technical solution.  During this process, MPS requires its customers to agree to keep the

technical information confidential for the purpose of resolving the issue only, and not to

disseminate it further.  MPS would not send its customers confidential technical information

without that agreement.  (*Id.* ¶ 4.)  MPS only sends its customers specific confidential

information required to resolve a technical issue when necessary.  Just because MPS sends

---

[1] The Declaration of MPS employee Rohan Samsi in support of this Motion will be referred to as
"Samsi Decl." throughout.

particular confidential information to one customer to resolve one specific issue that occurs only under specific conditions does not mean it is appropriate for other customers to see that same technical information.  (*Id.* ¶ 5.)

**C.     Intersil Unlawfully Obtained and Is Improperly Disclosing MPS Trade Secrets About The Operation of MPS Products.**

Intersil has unlawfully obtained MPS trade secrets from one of MPS's customers, and now Intersil is improperly using and disclosing MPS's trade secrets to other current and potential customers of MPS in an apparent effort to fraudulently induce these customers to purchase Intersil products, instead of MPS products.

MPS believes that Intersil obtained MPS's trade secrets by misappropriating MPS confidential information from MPS's customer Super Micro Computer, Inc. ("Supermicro"). Supermicro is a long-time MPS customer, and as with many of its significant customers, MPS has on occasion sent Supermicro confidential technical information with confidentiality markings.  (*Id.* ¶¶ 6–7.)  Supermicro understood and agreed that these communications are confidential and they have an obligation not to disclose them.  (*Id.* ¶ 7.)



The Failure Analysis presentation was provided to Supermicro by e-mail on or about September 19, 2016 under the longstanding confidentiality agreement MPS has with Supermicro.

(Samsi Decl. ¶ 11.)  Within the past week, MPS has been informed by several potential and current customers that Intersil has been disseminating a powerpoint presentation to MPS's potential and current customers entitled "MPS Issue", enclosed as **Exhibit B**.  (*Id.* ¶ 12.)  The presentation is clearly Intersil's because it has both the Intersil logo and Intersil's "Simply Smarter" trademark tagline.  (*Id.* ¶ 13; Ex. B at 1.)



Intersil's presentation contains information directly copied from MPS's Failure Analysis presentation, but with MPS's confidentiality markings, logo, and tagline stripped out.  ███



| Exhibit A (MPS Presentation) | Exhibit B (Intersil Presentation) |
|---|---|

[REDACTED]

MPS's trade secrets have never been provided to Intersil, and MPS has never provided confidential documents to its customers with authorization to further distribute information to Intersil, which is a direct competitor of MPS. As another participant in the semiconductor industry, Intersil would know that MPS's customers have a duty of confidentiality to MPS with respect to MPS's trade secrets. As a result, Intersil's acquisition of MPS's trade secrets was unauthorized and unlawful, and Intersil's continued improper use and disclosure of MPS's trade secrets must be enjoined.

## III.   LEGAL STANDARDS

When considering a motion for a temporary restraining order or preliminary injunction, the court determines: (1) the likelihood of success on the merits; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the balancing of the hardships to the respective parties; and (4) the public interest. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). "[A]n injunction may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (quoting *Holiday Inns of Am., Inc. v .B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969)). "The relevant inquiry is whether the movant is

---

[2] In addition to its trade secret claim, MPS is also asserting a defamation claim against Intersil due to Intersil's false and derogatory statements. While this motion for a temporary restraining order focuses on Intersil's misappropriation of trade secrets, Intersil's defamatory statements have also irreparably harmed MPS.

in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985).  Given the obvious irreparable harm caused by unauthorized disclosure of trade secrets, courts frequently find it appropriate to enjoin further disclosure at a preliminary stage.  *E.g.*, *Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 F. App'x 550, 554 (3d Cir. 2003).

## IV.     ARGUMENT

### A.     MPS Will Succeed on the Merits of its Trade Secret Claims.

There is no question in this case that Intersil has violated both Federal and Delaware trade secret law, because Intersil has both unlawfully obtained and improperly used and disclosed MPS's trade secrets.  Both Federal and Delaware trade secret law are predicated on the Uniform Trade Secrets Act ("UTSA"), and while there are some minor differences, the two statutes are similar or identical in most respects.  The essential elements of a trade secret claim are the same for both: (1) the information must qualify as a trade secret as defined in the statute; and (2) the defendant must have "misappropriated" the trade secret as defined in the statute.  *See*, *e.g.*, *Mattern & Assocs., L.L.C. v. Seidel*, 678 F. Supp. 2d 256, 269 (D. Del. 2010).

#### 1.     The Information Intersil Disclosed Qualifies As MPS's Trade Secrets.

As a threshold matter, MPS's confidential product operation data like that in the Failure Analysis presentation meets the statutory definition of trade secret for both Federal and Delaware law.  There is a minor difference in statutory definition between the two bodies of law, although it does not impact the analysis here.  Delaware law defines a trade secret as:

> (4) "Trade secret" shall mean information, including a formula, pattern, compilation, program, device, method, technique or process, that:
>
>> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>>
>> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

6 Del. C. § 2001(4).  The definition under Federal law is almost the same, except Federal law

explicitly lists examples of the type of information that qualify as trade secrets, including:

> all forms and types of financial, business, **scientific**, **technical**, economic, or **engineering information**, including patterns, **plans**, compilations, program devices, formulas, **designs**, **prototypes**, methods, **techniques, processes**, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing

18 U.S.C. § 1839(3) (emphasis added).  The examples identified in the Federal statute

underscore that the information Intersil is disclosing consists of trade secrets.  Intersil's

presentation of Exhibit B contains information directly copied from MPS's Failure Analysis

presentation. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████ (Samsi Decl. ¶ 8.)  This information falls squarely within the

definition of trade secrets.  *See, e.g., XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. CIV.A 09-157

JAP, 2011 WL 1226365, at *1 (D. Del. Mar. 28, 2011) (holding that "technical development

documents, schematics, [and] system architecture" are trade secrets).

Moreover, MPS took reasonable efforts to protect its confidential information like that in

MPS's Failure Analysis presentation.  Every page of the Failure Analysis presentation is marked

"MPS Confidential – Internal Use Only" and the cover page contains the additional marking "Do

Not Distribute."  (Samsi Decl. ¶ 8)  Supermicro has been an MPS customer for almost three

years.  (*Id.* ¶ 6.)  As with many of its significant customers, when MPS sent Supermicro

confidential documents, those communications were protected under confidentiality obligations,

especially where the documents like presentations and engineering documents are given

confidentiality markings.  Supermicro understood and agreed that these communications are

confidential and they have an obligation not to disclose them.  (*Id.* ¶ 7.)  MPS had not before had

an issue with Supermicro violating its confidentiality obligations, and MPS would not have sent Supermicro confidential technical information if it had known Supermicro would violate its confidentiality obligations.  (*Id.* ¶ 4.)  Courts have found such efforts satisfactory for establishing a trade secret.  *E.g.*, *Cerner Corp. v. Visicu, Inc.*, 667 F. Supp. 2d 1062, 1079 (W.D. Mo. 2009) ("Visicu took appropriate measures to maintain the secrecy of the eLert Guide by marking it as confidential and/or proprietary and requiring NDA's. Accordingly, this document qualifies as a trade secret.").  This element is satisfied.

## 2. Intersil "Misappropriated" the Trade Secrets As Statutorily Defined.

Intersil "misappropriated" MPS's trade secrets under both Federal and Delaware law, which have substantively identical statutory definitions of misappropriation.  *Compare* 18 U.S.C. § 1839(5) *with* 6 Del. C. § 2001(2).  In general, misappropriation is defined as either (1) acquisition of a trade secret through "improper means"; or (2) improper disclosure or use of a trade secret.  *Id.*  Here, Intersil has violated both prongs.  First, Intersil unlawfully has "acquir[ed] a trade secret" of MPS through "improper means."  18 U.S.C. § 1839(5)(A); 6 Del. C. § 2001(2)(a).)  At minimum, Intersil has "induce[d] a breach of a duty to maintain secrecy."  18 U.S.C. § 1839(6)(A); 6 Del. C. § 2001(1).  Intersil improperly obtained MPS's confidential information from MPS's customer Supermicro without regard to Supermicro's duty of confidentiality to MPS.  Intersil did so with full knowledge that MPS and Supermicro considered the operational data and failure analysis highly confidential.[3]  (Samsi Decl. ¶¶ 6–8, 11–14.)

Second, Intersil has unlawfully used and disclosed MPS trade secrets by giving its "MPS Issue" presentation to current and potential customers of MPS.  (*Id.* ¶ 12.)  This is a clear

---

[3] The details of how Intersil improperly obtained MPS's trade secrets from Supermicro are at present known only to Intersil, and will be developed further through discovery.  It is very possible that Intersil's conduct meets the statutory definition of "improper means" in multiple ways, such as being "theft, bribery, misrepresentation . . . or espionage through electronic or other means."  18 U.S.C. § 1839(6)(A); 6 Del. C. § 2001(1).  However, at minimum, it is clear that Intersil used improper means to obtain the confidential information from Supermicro, satisfying the statute.

violation of the statute because Intersil "used improper means" to acquire MPS's trade secrets as just described.  18 U.S.C. § 1839(5)(B)(i); 6 Del. C. § 2001(2)(b)(1).  It is independently also a violation because "at the time of [Intersil's] disclosure or use, [Intersil] knew or had reason to know that" Supermicro—from whom Intersil obtained the trade secrets—"owed a duty to" MPS to "maintain…secrecy."[4]  18 U.S.C. § 1839(5)(B)(ii)(III); 6 Del. C. § 2001(2)(b)(2)(c).  As another participant in the semiconductor industry, Intersil would know (or should have known) that MPS's customers like Supermicro have a duty of confidentiality to MPS with respect to MPS's trade secrets.  Intersil's conduct all but proves a high likelihood of success for MPS on the merits.  Indeed, courts have enjoined trade secret misappropriation where such misappropriation was only threatened.  *E.g.*, *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir. 2010).  Here, where MPS has indisputable evidence that Intersil has already disclosed MPS's trade secrets to MPS's irreparable detriment, an injunction to maintain the status quo, and prevent further dissemination, is proper.

**B.    MPS Is Threatened With Imminent, Irreparable Harm.**

MPS has already suffered irreparable harm through Intersil's unlawful disclosures, and MPS will continue to suffer additional irreparable and immediate harm if the highly sensitive technical information about the MP86905 and MP2955 product families in MPS's Failure Analysis presentation is made public to more of MPS's competitors and customers than has already occurred.  As MPS's business is the design, development and sale of highly technical and innovative semiconductor products, the main source of MPS's competitive advantage is its confidential trade secrets about the operation of its products, like the information contained in MPS's Failure Analysis presentation.  The information in MPS's Failure Analysis presentation could allow MPS's competitors and customers to copy MPS's products without expending the millions of dollars and thousands of hours of research and development that MPS has expended

---

[4] Once again, MPS expects that additional ways Intersil has violated the statute will be revealed in discovery, but Intersil's violation in the above-described manner is clear.

to make the technical breakthroughs that generated products like the MP86905 and MP2955 product families.  (Samsi Decl. ¶ 9.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████    ████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████

        The harm that MPS has experienced and will continue to experience consists of the loss of its valuable trade secrets to competitors and customers, as well as damage to its reputation. Loss of trade secrets alone is enough to establish immediate harm to MPS.  *See Neo Gen*, 69 Fed. App'x at 554–55 (finding that the disclosure of trade secrets would result in irreparable harm that would not be remedied by monetary damages); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (holding that loss of trade secrets was an irreparable harm that could not be measured in money because "a trade secret once lost is, of course, lost forever").

---

[5] As discussed in note 2, *supra*, MPS is also pursuing a defamation claim against Intersil for its false statements about this issue.

Moreover, MPS's loss of customers and reputation creates an even greater reason to enjoin Intersil's further unlawful disclosures.  If not restrained, Intersil will be able to acquire customers and market share to which it is not lawfully entitled, and MPS will lose customers and resultant profits.  (Samsi Decl. ¶ 16.)  Various Circuit courts, including the Third, have recognized that a loss of customers and reputation and, consequently, future profits is an irreparable harm sufficient to justify issuance of injunctive relief.  *See, e.g.*, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (finding that loss of market share can constitute irreparable harm); *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 602 (3d Cir. 1979) (affirming injunction because of "reasonable likelihood" of "an injury to his business reputation"); *BellSouth Telecomm., Inc. v. MCImetro Access Transmission Servs.*, LLC, 425 F.3d 964, 970 (11th Cir. 2005) (recognizing loss of customers is an "irreparable injury"); *Warren v. City of Athens*, 411 F.3d 697, 712 (6th Cir. 2005) (acknowledging loss of future profits is an "irreparable injury"); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19–20 (1st Cir. 1996) (recognizing the loss of future sales and customers as an irreparable injury); *Multi- Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (noting "the possibility of permanent loss of customers to a competitor" is an irreparable injury).  Further irreparable harm to MPS can only be thwarted through a temporary restraining order.

### C.    Granting a TRO to MPS Will Not Result In Harm To Intersil.

Intersil cannot credibly claim it will be unfairly harmed by the Court issuing a temporary restraining order.  A temporary restraining order to end Intersil's misuse of MPS's confidential information puts Intersil in no worse position than had it not acted unlawfully to obtain and misuse the trade secrets in the first place.  Intersil has no right to use or disclose MPS's trade secrets, and it will continue to do so if not stopped by this Court.

Moreover, any arguable temporary harm caused to Intersil is outweighed by the potential harm to MPS should Intersil continue to be allowed to use or disclose MPS's trade secrets, and to otherwise benefit from its unlawful actions.  The Third Circuit has held that even more restrictive

restraints placed on the non-moving party—like prohibition from soliciting certain customers—is outweighed by the harm of unlawful disclosure of trade secrets, and MPS is not seeking that level of restraint here. *Bimbo Bakeries*, 613 F.3d at119 ("the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party"). A temporary restraining order preventing disclosure of MPS's trade secrets will preserve the status quo for a time period during which Intersil could not lawfully have used MPS's trade secrets, and thus the balance of harms clearly weighs heavily in MPS's favor.

### D.    The Public Interest Factors Favor Granting a TRO to MPS.

Finally, the public interest would not be served if Intersil is permitted to violate Federal and Delaware law. The public interest would, however, be served by a temporary restraining order being issued to preserve the status quo until Intersil's conduct can be further addressed in this action. The public interest in preventing the misappropriation of MPS's trade secrets outweighs the temporary restriction on Intersil's improper use and disclosure of MPS's confidential information. *See Bimbo Bakeries*, 613 F.3d at119 ("there is a generalized public interest in upholding the inviolability of trade secrets and enforceability of confidentiality agreements") (quotation omitted); *SI Handling*, 753 F.2d at 1265 (finding unnecessary an "extended analysis of the public interest [because] extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established").

### E.    A Nominal Bond Is Appropriate.

Given the clear likelihood of success of MPS's trade secrets claim, there simply is no real chance that Intersil will ever be found to have been "wrongfully enjoined or restrained," so Intersil will never be entitled to recover MPS's required bond under Fed. R. Civ. P. 65(c). Moreover, even if the temporary restraining order is eventually found to be incorrect for whatever reason, Intersil will have not sustained any harm because it will have only been prevented from temporarily disclosing MPS's trade secrets, which it did not lawfully possess in the first place. For this reason, it is appropriate to set the Rule 65(c) bond at a nominal amount, such as one dollar. Where potential harm to the enjoined party is unlikely or nonexistent like

here, "a nominal bond [is] appropriate." *Neo Gen*, 69 F. App'x at 556.  Regardless, MPS will comply with the Court's order on an appropriate bond in the event this Motion is granted.

## V.      CONCLUSION

For the foregoing reasons, MPS respectfully requests that this Court enter a Temporary Restraining Order preventing Intersil from further misappropriation and improper use and disclosure of MPS's confidential trade secrets in the form of the enclosed Proposed Order.

ASHBY & GEDDES

/s/ *Tiffany Geyer Lydon*

*Of Counsel*                                   _____
                                               John G. Day (#2403)
John P. Schnurer                               Tiffany Geyer Lydon (#3950)
John D. Esterhay                               500 Delaware Avenue, 8th Floor
PERKINS COIE LLP                               P.O. Box 1150
11988 El Camino Real, Suite 350                Wilmington, DE  19899
San Diego, CA 92130-2594                       (302) 654-1888
(858) 720-5700                                 jday@ashby-geddes.com
jschnurer@perkinscoie.com                      tlydon@ashby-geddes.com
jesterhay@perkinscoie.com
                                               *Attorneys for Plaintiff*
Dated:  December 6, 2016                        *Monolithic Power Systems, Inc.*

# EXHIBIT A

# REDACTED IN ITS ENTIRETY

# EXHIBIT B

# REDACTED IN ITS ENTIRETY